THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:13CR00286 |
| Plaintiff, | ) | |
| vs. | ) | MEMORANDUM DECISION AND ORDER ADDRESSING MOTION TO SUPPRESS |
| MICHAEL E. PETTIT, | ) | |
| Defendant. | ) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## I. INTRODUCTION

Alleging that his Fourth Amendment rights were violated, Mr. Pettit has moved to suppress all evidence obtained as a result of the traffic stop of his vehicle. An evidentiary hearing was held, followed by post hearing briefing.

These are the relevant facts and allegations. On the afternoon of April 17, 2013, Trooper Thomas Simpson of the Utah Highway Patrol was traveling behind a Toyota Camry eastbound on I-80 when he observed it cross over the white fog line several times. The Camry was traveling approximately 45 miles per hour.

When Trooper Simpson first got behind the Camry it was snowing and the roads were wet for about three-quarters of a mile, and then the snow stopped and the roads were dry. The terrain was mountainous. The speed limit at that location is 65 miles per hour, but there are cautionary signs that say 45 miles per hour due to curves and semi-truck traffic.

Trooper Simpson initiated a traffic stop on the Camry for crossing the white line. When he greeted Mr. Pettit, the driver and sole occupant, Mr. Pettit, referencing the storm, stated that it scarred the hell out of him. Trooper Simpson explained why he had stopped Mr. Pettit and asked for his license, registration and proof of insurance.

Mr. Pettit stated that it wasn't his car. He produced the registration but not his driver's license. Trooper Simpson testified that the lower half of Mr. Pettit's body was "kind of" moving nervously.

Trooper Simpson asked Mr. Pettit about the car, where he was coming form, where he was going, and whether he had luggage. Trooper Simpson states that Mr. Pettit reported that he had flown to California to pick up the vehicle for a friend. Mr. Pettit gave consent when asked if Trooper Simpson could look in the trunk and opened the trunk for him.

During this initial encounter, Mr. Pettit stated twice within a brief period that Trooper Simpson made him nervous. After Trooper Simpson began asking about the luggage, Mr. Pettit stated that Trooper Simpson was making him nervous. Approximately 25 seconds later Mr. Pettit again stated that Trooper Simpson was making him nervous.

Trooper Simpson requested that Mr. Pettit remain in the car and he again asked for Mr. Pettit's driver's license. When Mr.

Pettit went through his wallet Trooper Simpson noticed that he skipped over a California license before he retrieved and gave Trooper Simpson a Missouri license.

Trooper Simpson looked through the trunk and the luggage[1] before going to his patrol car to request a driver's license check on Mr. Pettit for both California and Missouri. That check reflected that his license was suspended in both states.

Trooper Simpson prepared a citation and returned to talk with Mr. Pettit, who denied any knowledge that his driver's license was suspended on both states.

Mr. Pettit was again questioned about the circumstances of his trip and his possession of the car. Mr. Pettit stated that his friend had called him to come to California to get the car because she had to fly out of state to somewhere else to help her dad with a health problem. He stated that he had no knowledge why his friend was in California.

Based on those facts, Trooper Simpson requested permission to search the whole car. Mr. Pettit consented. He got out of the car, was patted down for weapons and stood on the shoulder of the highway. About this same time, Trooper Simpson requested that dispatch run a criminal records check on Mr. Pettit. Dispatch

---

[1]Trooper Simpson's first request to look in the trunk occurred early in the encounter prior to running checks on Mr. Pettit. That search took little time and produced no contraband.

reported back that Mr. Pettit had multiple arrest for felonies, including drug offences.

While Trooper Simpson was searching, two canine officers arrived. One of the dogs was deployed around the car and gave a positive alert. Subsequently the spare tire was found to have some item inside it and the canine alerted on the spare tire. The car was taken to a local garage and a bag was removed from the tire. The contents of the bag tested positive for cocaine.

## II. DISCUSSION

The Government challenges Mr. Pettit's assertion that he has standing to challenge the search of the vehicle in his possession, and that Trooper Simpson unlawfully exceeded the scope of the stop of his vehicle.

### A. Standing

"To establish standing to challenge a car search, the defendant bears the burden of showing that he had a 'legitimate possessory interest in or [a] lawful control over the car.'" *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003)(citations omitted). However, "[b]ecause the focus of the inquiry is on reasonable expectations, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself." Id.

The Court considers "two factors in determining whether a defendant has standing to assert a violation of his Fourth

4

Amendment rights: 'whether the defendant manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable.'" *United States v. Parada*, 577 F.3d 1275, 1280 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 3321 (2010)(citation omitted). In the automobile search context, the following have been held important, but not determinative.

> (1)whether the defendant asserted ownership over the items seized from the vehicle; (2)whether the defendant testified to his expectation of privacy at the suppression hearing; and (3)whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle.

*Id.* (internal quotation marks and citation omitted). Whether the defendant had personal belongings in the area to be searched is another factor "considered in determining whether the defendant meets the two-part standing test." *Id*.

The Court concludes that Mr. Pettit has standing to challenge the search of the vehicle he was driving. He was the driver and sole occupant of the car. He informed Trooper Simpson that it was not his car, but that he was driving the car with permission from the owner. He offered Trooper Simpson a viable explanation for having possession of the vehicle and he produced the car's registration.[2] No attempt was made to contact the owner to verify

---

[2]Although that explanation is somewhat inconsistent with his later testimony, his explanation for possession of the vehicle remains viable.

that explanation.  When asked, Mr. Pettit informed Trooper Simpson that he had personal belongings in the car's trunk, thereby asserting ownership over those belongings.  In the Court's view, Mr. Pettit's expectation of privacy in the car's trunk is subjectively reasonable, and it is objectively reasonable for society to recognize that expectation.

**B. Warrantless Search and Seizure**.

Traffic stops are seizures within the meaning of the Fourth Amendment, which protects citizens from unreasonable searches and seizures.  *United States v. White*, 584 F.3d 935, 944-45 (10th Cir. 2009), *cert. denied*, 559 U.S. 985 (2010)..  "A routine traffic stop constitutes an investigative detention and is examined under the principles announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 ... (1968)".  *United States v. Williams*, 403 F. 3d 1203, 1206 (10th Cir. 2005).

The court makes a two step inquiry when addressing the reasonableness of an investigative stop.  The first inquiry is "whether the stop was justified at its inception."  *Id*.  The second inquiry is "whether the officer's conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop."  *Id*.

Because this case involves a warrantless search, "the government bears the burden of proving the reasonableness of a

search or seizure." *United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir.), *cert. denied*, 132 S. Ct. 435 (2011)(citation omitted).

### 1. The Initial Stop

Trooper Simpson testified that he stopped Mr. Pettit for crossing over the white line multiple times.[3] It is uncontested that the initial stop was permissible. Accordingly, the stop of Mr. Pettit was justified at its inception and the traffic stop was valid and legal based on reasonable suspicion of a motor vehicle violation.

### 2. Scope of the Stop

"'In addition to being justified at its inception, a lawful traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place. A seizure that is justified solely by the interest in issuing a warning ticket to the driver may become unlawful if it is prolonged beyond the time reasonably required to complete that mission.'" *White*, 584 F.3d at 949 (citation omitted).

---

[3] "A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir.), *cert. denied*, 129 S.Ct. 2881 (2009). The officer's subjective motives are irrelevant and the Court examines only whether the stop was objectively justified. *White*, 584 F.3d at 945.

During a routine traffic stop, an officer may request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings. *United States v. Williams*, 271 F.3d 1262, 1267-68 (10th Cir. 2001). And an officer may ask questions unrelated to the reason for the stop as long as the questioning does not extend the length of the detention. *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1258 (10th Cir. 2006).

Mr. Pettit contends that Trooper Simpson "failed to quickly effectuate the purpose of the stop and end the interaction when his purpose had concluded", but instead he "continued to question Mr. Pettit and search the vehicle and his belongings until additional officers could arrive, including a K-9 who then did a drug sniff of the vehicle." Mem. Supp. at 7.[4]

Mr Pettit was stopped for crossing over the solid white line. Trooper Simpson listened to Mr. Pettit's explanation about how he came in possession of the car. He took no steps to verify that explanation with the owner of the car. After checking the validity of Mr. Pettit's driver's license, Trooper Simpson could have issued a citation, a warning, or in view of Mr. Pettit's suspended license, arranged some other disposition related to his operation

---

[4]The United States asserts that "[e]ach consent to search took place during the traffic investigation and there was no extension of the detention." Opp'n at 12.

8

of the car.[5]  However, the record does not reflect that a citation was issued, or that Mr. Pettit's driver's license was returned. Trooper Simpson continued to question Mr. Pettit and requested consent to search the entire car.

After an initial traffic stop by an officer, "further detention [of the driver] for purposes of questioning unrelated to the initial traffic stop is impermissible unless: (1)the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2)the initial detention has become a consensual encounter."  *Untied States v. Bradford*, 423 F.3d 1149, 1156-57 (10th Cir. 2005).

### a. consensual encounter

As noted, extension of the encounter is permissible if the detention becomes consensual.  However, the Court cannot conclude that the encounter was consensual under the facts presented.

The Tenth Circuit "'follows the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to [him].'" *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308-09 (10th

---

[5]Although Mr. Pettit had failed to produce a valid driver's license, it appears that Trooper Simpson was disposed initially to issue a citation. *See*  Tr. at 12.

Cir. 2006)(citation omitted).[6] That, and similar cases, "stand for the proposition that during a 'routine traffic stop, an officer's retention of a defendant's documents is significant because it indicates that the defendant, as a general rule, did not reasonably feel free to terminate the encounter and, therefore, the government cannot rely on the defendant's consent to justify further detention, questioning, or a search.'" *United States v. Valenzuela*, 494 F.3d 886, 891 (10th Cir.), *cert. denied*, 552 U.S. 1032 (2007)(citation omitted).[7]

There is no record of a citation being issued or that Mr. Pettit's license had been returned. Because the prolonged detention of Mr. Pettit was not consensual, the government cannot rely on Mr. Pettit's consent to justify the prolonged encounter or Trooper Simpson's warrantless seizure and search.

---

[6]"'The return of a driver's documents is not, however, always sufficient to demonstrate that an encounter has become consensual. ... The issue [then] is whether law enforcement conduct as perceived by a reasonable person would communicate that the person was not free to decline law enforcement requests or end the encounter." *Guerrero-Espinoza*, 462 F.3d at 1309 (citations omitted).

[7]The government's reliance on *United States v. Polly*, 630 F.3d 991 (10th Cir. 2011), for the proposition that consent can come before the encounter is ended, is misplaced. In that case, defendant's statement, "I don't care," when asked whether the officer could do a pat-down search on him before putting him in the patrol car while citations were prepared was viewed as consent to search his person, was based on officer safety considerations, and was found to be reasonably related to the circumstances that justified the stop.

### b. reasonable suspicion

As noted, a "'traffic stop [also] may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *White,* 584 F.3d at 949 (quoting *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009)). The Court considers the totality of the circumstances in deciding whether an officer had acquired reasonable suspicion of other criminal activity. *Id*. at 950. "'[T]he level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause.'" *Id* (quoting *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir.), *cert. denied*, 129 S. Ct. 2418 (2009)). And a factor that by itself is not proof of illegal conduct and is consistent with innocent travel, may nevertheless raise objectively reasonable suspicions. *Id*. However, "'unparticularized hunches' based on indicators 'so innocent or susceptible to varying interpretations as to be innocuous' cannot justify a prolonged traffic stop or vehicle search." *Id*. (citation omitted). The Court is mindful, nevertheless, that officers are allowed "'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained

person.'" *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011).

Before and during the initial part of the stop, Trooper Simpson knew the following. Mr. Pettit was driving 20 miles per hour under the posted speed limit of 65 while Trooper Simpson followed behind him. He continued at that speed after they emerged from the snow storm and the pavement was completely dry. Mr. Pettit had crossed over the solid white line several times. Mr. Pettit was driving from California to Missouri. After he was stopped, Mr. Pettit appeared nervous and he stated twice in a brief period that Trooper Simpson made him nervous. The lower half of his body was "kind of" moving nervously. Trooper Simpson had to ask Mr. Pettit twice for his driver's license. While retrieving his license, Trooper Simpson saw Mr. Pettit skip over a California driver's license before handing over a Missouri license. Mr. Pettit's explanation for how he came to be in possession of the car was somewhat vague as to details. For example, although he stated that he had gone to California to drive the car back to Missouri for a friend, he didn't know why his friend was in California, nor did he know many details about the health emergency of her father which necessitated him having to drive the car for his friend. Both Mr. Pettit's Missouri and California driver's licenses were suspended.

Considered together under the totality of circumstances, as the Court must, the Court concludes that Trooper Simpson had an objective reasonable basis for suspecting that Mr. Pettit was involved in criminal activity sufficient to justify prolonging the stop. Mr. Pettit's explanation for why he was traveling, and how he came to be in possession of the car, could reasonably be viewed by Trooper Simpson as suspicious. *See, e.g., White*, 584 F.3d at 951 ("implausible travel plans can form a basis for reasonable suspicion"). An individual's nervousness when considered with other circumstances may contribute to a reasonable suspicion of illegal activity. *Davis*, 636 F.3d at 1291. Having driver's licenses in suspension status from two different states, combined with the other information available also, in the Court's view, would merit further inquiry and could reasonably suggest suspicious or illegal activity. And driving below the posted speed limit while being followed by an officer, when combined with the other circumstances, also could be viewed as suspicious. Because the traffic stop was permissibly expanded beyond its original purpose based on Trooper Simpson's reasonable suspicion, the Court rejects Mr. Pettit's position that continued detention was unlawful.

### (1) consent to search

Mr. Pettit contends that his consent was not voluntary.

Whether consent is voluntary is determined by application of a two part test: (1) "the government must proffer clear and

13

positive testimony that consent was unequivocal and specific and freely given, and (2) the government must prove that this consent was given without implied or express duress or coercion. Additionally, an individual may voluntarily consent to a search even though he is detained." *Davis*, 636 F.3d at 1292-93 (internal quotation marks and citations omitted).

Here there was no physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or aggressiveness. Only one officer was on the scene when consent was given. The encounter took place in public on an Interstate Highway. Trooper Simpson never displayed his weapon or exhibited any aggressiveness. He was courteous at all times. Mr. Pettit immediately and without hesitation or equivocation agreed to the search of the entire vehicle. The Court concludes, therefore, that Mr. Pettit's consent was voluntary.

Once the dog alerted to the exterior of the car and the spare tire for the presence of drugs, Officers had probable cause to believe illegal drugs were present for purposes of detaining Mr. Pettit, continuing the search and moving the car to a nearby garage.

### III. CONCLUSION

For the reasons stated, the Court concludes that the government has met its burden of proving the reasonableness of the

seizure and search. Therefore, Mr. Pettit's Motion to Suppress Evidence (Doc. #19) is denied.

IT IS SO ORDERED.

DATED this 2nd day of October, 2013.

BY THE COURT:

_____
DAVID SAM
SENIOR JUDGE
UNITED STATES DISTRICT COURT